DETERMINED IN THE

# FOURTH DEPARTMENT

AT

## GENERAL TERM,

### February, 1891.

---

JOHN FITZGERALD, as Administrator, etc., of THOMAS FITZGERALD, Deceased, Respondent, *v.* THE NEW YORK CENTRAL AND HUDSON RIVER RAILROAD COMPANY, Appellant.

*Contributory negligence on the part of a brakeman injured by a bridge.*

A brakeman upon a railroad, who is aware of the fact that no warning signals have been placed at a bridge which crosses the tracks, and that the bridge is so low as to render it dangerous, and who is injured by such bridge by reason of his not exercising the care necessary to enable him to escape the consequences of such defect, is guilty of contributory negligence which precludes his recovering damages from the railroad company, although the railroad company has violated the provision of chapter 439 of the Laws of 1884, requiring that suitable warning signals should be placed at such bridge.

APPEAL by the defendant from a judgment of the Supreme Court, in favor of the plaintiff, entered in the office of the clerk of the county of Herkimer on the 11th day of August, 1890; and also from an order denying a motion for a new trial, made on the minutes of the court after a trial at the Herkimer County Circuit, at which a verdict was rendered in favor of the plaintiff for the sum of $3,000.

The action was brought to recover the damages resulting from the death of the plaintiff's intestate, who was a brakeman in the

employ of defendant and was killed in passing under the structure known as Wheeler's bridge near the city of Syracuse.

*C. D. Prescott*, for the appellant.

*Hadley Jones*, for the respondent.

HARDIN, P. J.:

On the morning of November 11, 1887, plaintiff's intestate, Thomas Fitzgerald, then a brakeman in the employ of the defendant, was passing over its road eastwardly from Syracuse, and between five and six o'clock in the morning the train, in passing eastwardly from Green's Corners, and distant from the station at Green's Corners 5,153 feet, passed under a superstructure known as "Wheeler's Bridge." Just before the train reached the bridge the intestate passed from the engine to the tender, and from thence up on to the first car, where he was last seen alive. Shortly after the train had passed from under the bridge he was discovered lying a little south of the walk-way near the center of the car, apparently dead. The train ran on down to Rome. He was at the time acting as head-brakeman on the train. When passing Green's Corners he sat on the seat with the fireman, who had some conversation with him, and just east of Green's Corners he remarked to the fireman, "We are going down a grade out here, are we not?" The fireman replied in the affirmative; the fireman told him that he "need not get on top as it was not necessary to hold it going down that grade;" he then went and "stood in the gangway between the engine and the tank." The fireman testifies that he repeated to the deceased three times "that there was no necessity to go on top." And the fireman further testifies: "The engineer was then sitting on his side, opposite me, on the right hand side and watching in front." The fireman further testified: "After I had called to him three times I saw him standing on the top of the car next to the tender; he was standing clear up on top of it; I spoke to him three times in all — first, before he got off the seat, and twice after; I called to him the third time when he was climbing up the ladder to get on the car; I called him again to come back, that he shouldn't get up there; that there was no need of setting the brakes. When he commenced climbing up onto this car he was, perhaps, about half-way

between the station and the bridge; I should judge it was between five and six o'clock A. M.; after I saw him standing on top of that first car I did not notice him again until after we had passed the bridge; I then climbed up the ladder till I could see on this first car; I saw him lying down very near the center of the car; I went back and reported and the engineer blew brakes." The fireman testifies: "It was a cold, disagreeable, cloudy morning; it was not fairly daylight yet; I won't say as to whether there was difficulty in seeing a great ways." The train had thirty-two cars, twenty-nine of which were refrigerator cars; the refrigerator cars are twelve feet five inches above the tracks; ordinary cars are ten feet nine inches. There was no evidence given upon the trial of the height of the deceased. Evidence was given tending to show that there were no "tell-tales" or warning signals erected or maintained west of the bridge to give warning that the train was approaching a low bridge. It was, therefore, insisted, in behalf of the plaintiff, that the defendant had not complied with the provisions of chapter 439 of the Laws of 1884. By the second section of that act it is provided that every steam railroad shall "erect and thereafter maintain such suitable warning signals at every low bridge or structure which crosses the railroad above the tracks, where such warning signals may be necessary for the protection of employees on top of cars from injury." And our attention is called to *Willy* v. *Mulledy* (78 N. Y., 314), where it was said that "when a statute imposes a duty upon a public officer, it is well settled that any person having a special interest in the performance thereof may sue for a breach thereof causing him damage; and the same is true of a duty imposed by statute upon any citizen;" and it is insisted, in behalf of the respondent, that the deceased had a right to suppose that the defendant had complied with the provisions of the statute to which reference has been made. However, if the deceased had become aware of the fact that there had not been a compliance with the statute, that no "tell-tales," or signals, or warnings had been erected west of the bridge, it was his duty to use care and caution in approaching the bridge to avoid receiving injuries therefrom. The case seems to be barren of any evidence indicative of any watchfulness or care on the part of the deceased to avoid the injury which came to him. It, therefore, becomes important to inquire whether

he was aware of the fact that the bridge was such an one as required him to avoid an erect position in passing under it, he being upon the top of a car. It appears by the testimony of the plaintiff's witness, Mitchell, who was a conductor upon the train, that "on the morning of November 11, 1887, the weather was somewhat stormy; it was dark;" it snowed and blew from the north-west. And it further appears "plaintiff's intestate went up the road westerly with me; at the Wheeler bridge we were in the caboose together in the evening; it was between daylight and dark so you could see. Our lights were lit in the caboose." The witness further continues and testifies as follows: "We reached Rome at 5.20 P. M.; we passed Wheeler's bridge seven to ten minutes later; I understood this was Fitzgerald's first trip as a brakesman on through freight. While in the cupola I told him we were then going up Wheeler's grade. That commences just a little ways out of Rome. I told him that it extended beyond the bridge. He said: 'There is a bridge above here somewhere, isn't there?' I told him there was, and I would show it to him as soon as we got there; I showed him the bridge; the one spoken of on this trial; I told him to look out for all bridges; that I didn't know but that the bridge might clear him on an ordinary car, and on a higher car it might not; that I would not be positive as to either. *He said he had been up at Wheeler's bridge before.* I asked him how, and he said he had been there on a work train. As we reached the bridge I spoke of it to him, of its being the Wheeler bridge; the tenth was a pleasant day; the light was then so we could see the bridge very plainly; the lookout, or cupola, in the top of the caboose is higher than the highest cars; he stayed in the cupola with me until we reached De Witt." According to this witness' testimony, the deceased had an opportunity to inspect, observe and learn the condition of the bridge, and, according to this witness' testimony, the deceased, while engaged upon working trains on previous occasions, in the employ of the defendant, had been in proximity with the bridge. If this evidence is accepted as it is stated, it seems to indicate that the deceased was aware, not only of the fact that the bridge was there, but that it was a low bridge, and that apparently he learned that there were no warnings or tell-tales to direct his attention when approaching from the west. The evidence brings

the case, if believed, within the principle laid down by the Court of Appeals, Second Division, in *Williams* v. *Delaware, Lackawanna and Western Railroad Company* (116 N. Y., 632). In the opinion delivered in that case it was said : " The only question which we shall consider in this case is as to whether or not the plaintiff was guilty of contributory negligence, and this depends upon the question as to whether he knew, or ought to have known, that this bridge was low, and that he could not pass under it while standing upon the top of the box car." The learned judge, after quoting the evidence in that case, proceeds to observe : " It is quite evident from this testimony, that he had, on numerous occasions, passed under this bridge whilst on top of the train, and if so, he must have known, had he exercised ordinary care and observation, that it was not of sufficient height to permit a person to pass under it whilst standing upon the top of a box car of the company ; &ast; &ast; &ast; and, inasmuch as such negligence appears from his own testimony, the exception to the refusal of the defendant's motion for a nonsuit was well taken."

In *Ryan* v. *Long Island Railroad Company* (51 Hun, 608), it was held that " the plaintiff was not entitled to recover, as it was shown that the deceased had passed these bridges for three months, and that it was fully understood, by the employees of the defendant, that these bridges had warning signals at each end of the four bridges, and that these signals were a warning for all the bridges," and the condition of the signals or warnings which were placed, and the omissions of others which the plaintiff insisted were necessary. Although that case is distinguishable from the one before us, in that the deceased had been, for a greater length of time, accustomed to pass and repass the bridges where the accident occurred ; and while there were some warning signals, and others were omitted, it was said " that the warning signals were apparent and the deceased assumed the risk of an omission of any others." It was suggested, by the learned counsel for the respondent upon the argument, that the jury had a right to reject and disbelieve the testimony of Mitchell, because he was a conductor in the employ of the defendant, but it appears the plaintiff called him as a witness and thereby vouched for his credibility (*Hunt* v. *Fish*, 4 Barb., 324) ; and nothing is to be perceived in his testimony rendering the same improbable.

Nor do the circumstances detailed by him give rise to the suspicion that he has stated anything other than the truth.. While the learned judge carefully commented upon the evidence, yet, in speaking of the question we have been considering, he, perhaps, did not, with his usual accuracy and clearness, express to the jury the rule of law applicable to the evidence which had been adverted to ; he said : " Then there is another thing which is suggested why he was guilty of contributory negligence, and that is, that he had been informed that there was a low bridge, and, therefore, he was negligent in not looking out for it and escaping. That is a question for you as the other is. Of course, if he did know and realize that at that particular point there was this low bridge, then you may say whether he exercised ordinary care or not in passing along, standing upright upon the car, without recollecting the bridge and getting out of the way. As has been suggested, merely forgetting what the condition of things was, forgetting that he was in a dangerous locality, will not do, because that is his negligence." Later on the judge expressly refused to charge " that there is no evidence in this case that the deceased did not know the danger of the Wheeler bridge."

These views lead us to the conclusion that a new trial should be ordered.

MARTIN and MERWIN, JJ., concurred.

Judgment and order reversed on the exceptions and a new trial ordered, with costs to abide the event.